# COURT OF APPEALS OF VIRGINIA

## Record No. 1083-25-2

JOHN WILLIAM MOORE, II

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Callins, Duffan and Senior Judge Clements

Opinion Issued August 4, 2026[*]

### FROM THE CIRCUIT COURT OF ORANGE COUNTY
David B. Franzen, Judge

(Anthony D. Martin; Anthony Martin Legal, PLLC, on brief), for appellant.

(Jason S. Miyares,[1] Attorney General; Liam A. Curry, Assistant Attorney General, on brief), for appellee.

### MEMORANDUM OPINION BY
### JUDGE KEVIN M. DUFFAN

John William Moore, II, was convicted by an Orange County Circuit Court jury of felony child cruelty and misdemeanor sexual battery, under Codes §§ 40.1-103 and 18.2-67.4, respectively. He was sentenced to 5 years' and 12 months' incarceration, with 5 years suspended, for an active sentence of 12 months. On appeal, he argues there was insufficient evidence to prove (1) child cruelty because he did not have custody over the victim and he did not treat her

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

cruelly and (2) sexual battery because he did not touch the victim's intimate parts and he did not force or intimidate her. For the following reasons, we affirm the judgment of the circuit court.[2]

BACKGROUND

On December 28, 2023, M.B. was 14 years old; she was 15 years old at the time of trial.[3] Moore and his wife, Samantha, were the foster parents of M.B. and her brother, J.B. M.B. and J.B. had lived in the Moore household since April 2022, and Samantha obtained legal custody of the two siblings after "six [or] seven months" of living together. Moore had no legal custody over the siblings. Also living in the Moore household were the couple's two biological children, a daughter, L.M. and son, J.M., and the couple's nephew, C.B.[4] By December 2023, M.B. and J.B. had been living with the Moores for 22 months.

At trial, M.B. testified that on December 28th, everyone was home except L.M. When describing what was "out of the ordinary" on that night, M.B. said that she was in the living room with Moore and C.B, who was four years old at the time. While sitting with C.B., M.B. noticed Moore "eyeing [her] down" from the other couch in the room. She left to put a dish in the sink, then went to let her dog out, at which point Moore also came outside and told her, "I'm watching you," before going back inside.

M.B. testified that Moore's eyes were "bloodshot" and that his speech was "slurred." She stated that Moore's demeanor that night was similar to how her biological father acted, "whenever . . . he got drunk." Investigator Erik Peterson, who conducted Moore's investigation

---

[2] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." *See* Code § 17.1-403(ii)(c); Rule 5A:27(c).

[3] We use initials to protect the privacy of all minors involved in this case.

[4] Moore's brief says that C.B. was his child, Samantha testified that C.B. was their nephew.

- 2 -

and testified at trial, testified that Moore told him that he was not drinking that night. Samantha also testified that she did not think that Moore drank that night, and he did not appear to be under the influence.

After coming back inside the house, M.B. testified that Moore "ended up exposing" "his private part" through the leg of his shorts while he was sitting down on the couch. M.B. clarified that Moore's penis was "[n]ot, . . . fully out" but "you could see it." So, she grabbed the dog, told him that she was going to bed, and went to her room. When she got to her room, Moore sent M.B. a Snapchat message reading, "I'm sorry if I exposed myself, it's comfortable." She responded "okay, or something like that," and "just le[t] it be."

After about five minutes, Moore came into her room and touched her while lying on her lofted bed. She testified that she knew something was off because Moore would not normally come into her bedroom, that he would just "pop[] his head in." M.B. testified that she was wearing shorts, and that "[Moore] came into the room, and then he ended up going, taking his hand under the covers between my thighs and touched my butt, . . . pinched a little bit under it." M.B. reiterated that Moore pinched her "between [her] legs and touched [her] butt." Then Moore just "walked out."

M.B. testified that Moore came back a second time and "had his hand [on] [her] inner thigh, close to [her] area" and that Moore told her "if you ever need to talk, you can come out here and sit out here on the couch and we can talk." She told him, "no, that [s]he was going to bed." Moore responded, "sorry, didn't mean to make you feel uncomfortable."

M.B. further testified that during this second encounter, Samantha passed by and asked, "why are you in [M.B.'s] room? [w]hy are you in the other room?" and "[w]hy are you in and out of [M.B.'s] room?" M.B. testified that Moore responded, "I'm just apologizing to her for yelling at [her]," which M.B. stated, "was not true." Samantha also testified that when she went

- 3 -

to the bathroom that night, she saw Moore standing in the doorway of M.B.'s room, so she asked if "anything was wrong, and he said 'no, that he was just talking to the girls.'" She asked because normally, when the children went into their rooms at night, "that[] [was] it." But that night, "they were not . . . [a]sleep at that time."

M.B. explained at trial that she would not have been able to get away from Moore because she was lying on a lofted bed and the ladder was not near her, so "there was no way [she] could get [to the ladder] quickly enough." Moore was also bigger than M.B., so she felt that "there [was] no way [she] could defend herself."

M.B. proceeded to text her friend, C.S., two hours after Moore left her room.[5] C.S. testified that she and M.B. messaged each other on Snapchat "pretty consistently," but that M.B. interrupted their regular conversation and mentioned that "[Moore] was touching her inner thigh." C.S. testified that M.B. mentioned that "[Moore] was drunk and that . . . he touched her inner thigh and right under her butt." C.S. told M.B. that she should tell J.B., but M.B. decided to tell her mother. [6]

Laura Taylor, M.B.'s biological mother, testified that, on that night, she received a text from M.B. that read only "mom." After repeatedly asking M.B. what was going on and whether "[she] should be worried," M.B. insisted that she would tell Taylor during their next visit. During that visit, M.B. told Taylor that "Moore touched her in between her thighs, near there, her

---

[5] The Commonwealth admitted the text messages between M.B. and C.S. without objection from Moore.

[6] "Although parts of the record are sealed, this appeal requires unsealing certain portions to resolve the issues raised by [the appellant]. To the extent that certain facts are found in the sealed portions of the record, we unseal those portions only as to those specific facts mentioned in this opinion." *Khine v. Commonwealth*, 75 Va. App. 435, 442 n.1 (2022). "The rest remains sealed." *Id.*

private parts," and so "[Taylor] went off and told [M.B.] [that] she need[ed] to tell somebody, we need to inform somebody."

At trial, Investigator Peterson testified that Moore told him that "he had gone into [M.B.'s] room [] to talk to her about her dog, and squeezed . . . her knee, and she gave him a look that he was not familiar with, did not like, he wasn't sure, and apologized to her." Moore also told Investigator Peterson that he told Samantha "he had tickled and . . . squeezed [M.B.'s] leg around the knee area." In reference to Moore's apology, Investigator Peterson testified that Moore "meant nothing by it when he initially touched [M.B.], and said that verbally. And then . . . sent her a text message saying that he didn't mean to be inappropriate."

After the Commonwealth rested its case, Moore made a motion to strike the evidence on all charges. In response to Moore's and the Commonwealth's arguments, the circuit court denied the motion to strike. After the Commonwealth's rebuttal evidence, Moore renewed his motion to strike all charges, which was again denied by the circuit court.

The jury returned verdicts of guilty on the felony child cruelty and misdemeanor sexual battery charges, and verdicts of not guilty on the taking indecent liberties with a child under the age of 15 and indecent exposure charges. Moore was sentenced to 5 years' incarceration with 4 years and 6 months suspended on the child cruelty conviction, and 12 months' incarceration with 6 months suspended on the sexual battery conviction, leaving an active 12 months' incarceration. Moore appeals.

ANALYSIS

## I. Standard of Review

On appeal, Moore challenges the sufficiency of the evidence for his convictions.

"When examining a challenge to the sufficiency of the evidence, an appellate court must review the evidence in the light most favorable to the prevailing party at trial and consider any reasonable inference from the facts proved." *Viney v. Commonwealth*, 269 Va. 296, 299 (2005) (quoting *Zimmerman v. Commonwealth*, 266 Va. 384, 386 (2003)). "The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is 'plainly wrong or without evidence to support it.'" *Id.* (quoting Code § 8.01-680).

Under this standard, "[a]n appellate court does not 'ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (alteration in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "Instead, the only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

"The inferences to be drawn from proven facts, as long as they are reasonable, are within the province of the trier of fact." *Hancock v. Commonwealth*, 12 Va. App. 774, 782 (1991) (citing *Johnson v. Commonwealth*, 209 Va. 291, 295 (1968)). Moreover, "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the *sole* responsibility to determine their credibility, the weight to be given to their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (emphasis in original) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998)).

"Resolving the question of the sufficiency of the evidence in this case also requires statutory interpretation. '[T]o the extent that the issue on appeal requires [a determination of] the meaning of a statute and its terms, [this Court] reviews that issue de novo.'" *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 334 (2021) (alterations in original) (quoting *Green v. Commonwealth*, 72 Va. App. 193, 202 (2020)). While criminal statutes must be "strictly construed against the Commonwealth, the appellate court must also 'give reasonable effect to the words used' in the legislation." *Id.* (quoting *Green*, 72 Va. App. at 202).

## II. Felony Child Cruelty

The Virginia statute criminalizing child cruelty states that:

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered or the health of such child to be injured, or willfully or negligently to cause or permit such child to be placed in a situation that its life, health or morals may be endangered, or to cause or permit such child to be overworked, tortured, tormented, mutilated, beaten or cruelly treated.

Code § 40.1-103.

Because Moore was acting *in loco parentis* of M.B. as living under his care, and because he engaged in cruel actions by touching her sexually, the circuit court was not plainly wrong in convicting Moore of felony child cruelty.

### A. Moore had custody over M.B.

Moore argues that the evidence was insufficient to convict him of child cruelty because he did not have legal custody over M.B.

Code § 40.1-103 "has been classified as a 'cruelty to children statute' which extends . . . to parents and those standing *in loco parentis* who have permanent or temporary custody of

children."[7]  *Lovisi v. Commonwealth*, 212 Va. 848, 850 (1972) (citing Monrad G. Paulsen, *The Legal Framework for Child Protection*, 66 Colum. L. Rev. 679, 682-83 (1966)).  The Virginia Supreme Court has stated that the language of this statute is "unambiguous, justifying no limitation of the meaning 'custody' to legal custody.  To give it such a restrictive definition would eliminate . . . all whom might have temporary custody of children, from the purview of the statute."  *Id.*  It concluded in *Lovisi* that "the custody provision in the statute is not restricted in application to those having legal custody of children and that it was a jury question whether [the stepfather] had custody over [the stepchild]."  *Id.*  The Court took note that Lovisi "provided food, shelter and clothing [for his stepchildren] after they came to make their home with him."  *Id.* at 849.

Moore neglects to mention that M.B. and J.B. had been living in the Moore household for almost 2 years—22 months—at the time of the touching.  Furthermore, Moore and Samantha were the only adults in the house living with and responsible for the five minors, including M.B.  Samantha also testified that Moore was "occasionally home alone with the kids" and that "he was in charge when he was [alone with them]" because she was employed.

Because a reasonable jury could have found that these facts proved that Moore had custody over M.B., despite not having legal custody over her, the Commonwealth presented sufficient evidence for this element under the child cruelty charge.[8]

---

[7] The defendant in *Lovisi v. Commonwealth*, 212 Va. 848 (1972), was convicted under a predecessor statute, Code § 40-112 (Repl. Vol. 1953), which at the time of trial became Code § 40.1-103 (1970).  The words of the statute existing in 1972 were the same as the statute as it exists today.

[8] Additionally, Moore's appeal is limited to the jury instruction's definition of child custody.  "[Jury] instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review."  *Smith v. Commonwealth*, 296 Va. 450, 461 (2018) (quoting *Wintergreen Partners, Inc. v. McGuireWoods, LLP*, 280 Va. 374, 379 (2010)).  The circuit court employed the *Lovisi* definition of "child custody" for jury instructions: child custody is defined as "[t]he care and keeping of anything" and "is not restricted in

B. Moore cruelly treated M.B.

Moore argues that he did not treat M.B. cruelly and that he did not put her life in danger, injure her health, or beat her. We disagree.

Before analyzing the merits of his child cruelty argument, we note it is immaterial that Moore was acquitted of indecent exposure and indecent liberties in the circuit court. While "[j]ury verdicts may appear inconsistent," the jury has nonetheless "elected through mistake, compromise, or lenity to acquit or to convict of a lesser offense for one charged crime that seems in conflict with the verdict for another charged offense." *Najacque v. Commonwealth*, No. 0845-23-1, slip op. at 8 (Va. Ct. App. Aug. 20, 2024) (quoting *Kovalske v. Commonwealth*, 56 Va. App. 224, 233 (2010)). Although the verdicts may seem inconsistent, "courts may uphold inconsistent verdicts, provided that the evidence supports the verdict challenged on appeal." *Id.* (quoting *Kovalske,* 56 Va. App. at 233). Therefore, "we must look to all the evidence presented . . . and determine whether it makes out a case of . . . child cruelty—no matter how the jury interpreted the evidence for the other charges."[9] *Id.*

To support his argument, Moore states that his case "[had] none of the cruelty factors that this Court found sufficient for a conviction of child cruelty in *Wilson*." This argument is unavailing because the Court in *Wilson* did not review any "cruelty factors." The *Wilson* case involved a defendant who was convicted of child cruelty against her three-year-old son, who had a learning disability, for a long list of physical abuses towards him, including: bruising on the arms, shoulder, back, buttocks, and legs; "plucking" his penis; smacks on the head; and beatings with a wooden spoon. *Wilson v. Commonwealth*, 31 Va. App. 495, 510 (2000). Further, the

---

application to those having legal custody of children." *Lovisi*, 212 Va. at 850 (quoting *Custody*, *Black's Law Dictionary* (4th ed. 1951)). Thus Moore's appeal is limited to this definition.

[9] The *Najacque* defendant was acquitted of rape, sexual battery, and taking indecent liberties in the lower court. Slip op. at 8.

Court in *Wilson* did not discuss any cruelty factors generally. *See id.* at 509-11. Also distinguishable are the kinds of abuse inflicted by the *Wilson* defendant and the abuse taking place in this case.

"Proving cruel treatment manifestly requires evidence of less severe behavior than proving torture." *Mollenhauer*, 73 Va. App. at 335. Furthermore, "[t]he statute covers a wide swath of criminal behavior (from mere endangerment to actual torture)." *Najacque*, slip op. at 7 (quoting *Barnes v. Commonwealth*, 47 Va. App. 105, 111 (2005)). "'Cruelty' is defined as the 'disposition to inflict pain or suffering.'" *Mollenhauer*, 73 Va. App. at 335 (citing *Cruelty*, *Webster's Third New International Dictionary* (1993)). "'[C]ruel[] treat[ment],' as used [under the statute], describes engaging in behavior toward another that causes physical or emotional pain or suffering in that other person." *Id.*

Moore displayed cruel treatment by inflicting suffering on M.B. throughout the sexual battery. He "eye[ed] [her] down" while she was alone in the living room with him, followed her outside, and exposed his penis to her when she came back into the house. M.B., responding to Moore's strange behavior, left to her bedroom, but Moore, again, followed her. Once in M.B.'s room, Moore touched her buttocks as well as the area under her buttocks, between her legs, and the inner parts of her thighs. After the touching, M.B. witnessed Moore lying to Samantha about why he had come into her room and subsequently messaged her friend that she was left "really uncomfortable" by Moore's conduct.

Although M.B. was not left with physical injuries, the evidence shows that she was physically and emotionally abused by Moore's battery. Because this Court has explained that under the statute, the Commonwealth does not have the high burden of proving child torture, and that inflicting emotional pain and physical suffering is sufficient as cruelty, a reasonable jury

could have found Moore's infliction of emotional suffering on M.B. along with his sexual battery sufficient. *Mollenhauer*, 73 Va. App. at 335.

### III. Misdemeanor Sexual Battery

The Virginia Code states that "[a]n accused is guilty of sexual battery if he sexually abuses, as defined in § 18.2-67.10,[10] . . . the complaining witness against the will of the complaining witness, by force, threat, intimidation, or ruse." Code § 18.2-67.4.

Because Moore touched M.B.'s buttocks, or alternatively, her groin area, against her will, the circuit court was not plainly wrong to convict him of sexual battery.

#### A. The Evidence was Sufficient to Prove a Touching of M.B.'s Intimate Parts

Moore argues that there is insufficient evidence to prove that he touched M.B.'s intimate parts, as required by statute, because he did not touch her genitalia, anus, breast, or buttocks. Moore references the definition of intimate parts from the relevant section of the Virginia Code: "'intimate parts' means the genitalia, anus, groin, breast, or buttocks of any person, or the chest of a child under the age of 15."[11] Code § 18.2-67.10(2).

M.B. testified that "[Moore] [put] his hand under the covers between [her] thighs and touched [her] butt, . . . pinched a little bit under it" and that he "had his hand in [her] inner thigh, close to [her] area." M.B. told her friend C.S., who testified at trial, that Moore "touch[ed] her inner thigh" "right under her butt." Furthermore, M.B. told her mother, Taylor, who testified at trial, that Moore "touched her in between her thighs, near there, her private parts."

---

[10] This is the section of the Code defining certain terms related to criminal sexual assault. Code § 18.2-67.10.

[11] Arguing on brief, Moore mentions that the jury clarified with the circuit court whether it was "limited" to the jury instruction regarding "intimate parts." The court responded that it was. The instruction was the following: "[i]ntimate parts means the genitalia, anus, groin, breast, or buttocks of any person."

- 11 -

We find that the jury could have credited M.B.'s generally consistent testimony that Moore touched or "pinched" her buttock area, which is considered an intimate part under the statute. *McNeal*, 282 Va. at 22 ("The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given to their testimony, and the inferences to be drawn from proven facts."); Code § 18.2-67.10(2). Alternatively, if the jury found that Moore did not touch M.B.'s buttocks, but touched the region under her buttocks or between her thighs, this would be considered her groin area, which is also statutorily considered an intimate part. Code § 18.2-67.10(2); *Groin*, *Merriam-Webster's Collegiate Dictionary* (12th ed. 2025) ("the fold or depression marking the juncture of the lower abdomen and the inner part of the thigh; also: the region of this line"). Therefore, we find that the Commonwealth presented sufficient evidence to prove this element under sexual battery.

B. The Evidence was Sufficient to Prove Force and Intimidation

Moore also argues that the Commonwealth did not present sufficient evidence to prove that he forced, threatened, or intimidated M.B. on the night of the altercation because there "was no testimony that [he] threatened the child or told her to say anything" and that he did not "[hold] [her] down when he was in her bedroom." Moore cites *Martin v. Commonwealth*, 272 Va. 31 (2006), to support his argument that he did not constructively force M.B. into doing anything.

However, the finding in *Martin* works contrary to Moore's argument because the Virginia Supreme Court defined "constructive force" as "an act undertaken against a victim's will and without the victim's consent" and that "constructive force exists if the victim could not legally consent to the fact." 272 Va. at 35. M.B. testified that after Moore eyed her down, he followed her outside, told her that he was "watching her," exposed his penis to her after she came back into the house, and that she "knew something was up" when he came into her room. Reviewing this chronology demonstrates that Moore's proceeding action in pinching her buttocks was, at the

very least, unanticipated, and we are mandated to make a reasonable inference that it was also taken against M.B.'s will and without her consent. *Id.*; *Viney*, 269 Va. at 299.

This Court has elucidated that "[t]he degree of resistance by the victim, and consequently, the degree of force required to overcome her will, 'necessarily depend[] on the circumstances of each case, taking into consideration the relative physical condition of the participants and the degree of force manifested.'" *Bondi v. Commonwealth*, 70 Va. App. 79, 88 (2019) (second alteration in original) (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 382 (2002)). "Circumstances supporting a finding of force include the victim's relationship to the defendant, the aggressive nature of the defendant's behavior, and the victim's fear during and after the crime." *Id.* at 89 (citation omitted). What may also be relevant are "the time and place of the crime, the victim's reaction during and after the incident, as well as the parties' relationship." *Id.* (citing *Wactor*, 38 Va. App. at 383).

Additionally, as explained in our application of *Martin* and constructive force to this case, the Commonwealth presented sufficient evidence to show that M.B. was uncomfortable and put off by Moore's behavior during and after the battery. After Moore made M.B. uncomfortable during the earlier part of the night, M.B. retreated to her bedroom—throughout this time she testified that Moore was acting "out of the ordinary" and that "something was up." Then after Moore pinched her buttocks, M.B. subsequently messaged her best friend that she was "shaking" and "wanting to fucking cry."

Under the Code, the Commonwealth may also present evidence to show intimidation, instead of force. Code § 18.2-67.4. The Supreme Court of Virginia has explained that "[i]ntimidation may occur without threats. Intimidation . . . means putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will." *Bondi*, 70 Va. App. at 88. "Intimidation may be caused by the imposition of

- 13 -

psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Id.* at 90 (alteration in original) (citing *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985)). "A factfinder may consider 'the victim's age, the relative size of the defendant and victim, the familial relationship between the defendant and the victim, and the vulnerable position of the victim' in evaluating whether the act was accomplished by intimidation." *Id.* (quoting *Commonwealth v. Bower*, 264 Va. 41, 46 (2002)). Specifically, "the parent-child relationship . . . supported the finding that [the defendant] [may] exercise[] emotional dominance over his daughter." *Id.* at 91 (first alteration in original) (quoting *Bower*, 264 Va. at 45-46).

Here, there was sufficient evidence for the jury to infer that Moore's method of eyeing, following, exposing, then cornering M.B. in her bedroom coupled with M.B.'s testimony that she was uncomfortable and knew that there was something strange about Moore's conduct would have intimidated M.B. as to put her under "psychological pressure." *Id.* at 90. A reasonable jury also could have inferred that Moore's text apology to M.B. before coming into her room and then his later verbal apology could have made M.B. even more uncomfortable, considering M.B.'s testimony that Moore lied to his wife about why he was in her bedroom at the time. Also, although Moore was not her biological father, his role *in loco parentis* over her would have allowed him to "exercise[] emotional dominance" over M.B. *Id.* at 91. Taken in totality, the evidence was sufficient for a jury to have found that Moore intimidated M.B. Not only was M.B. psychologically intimidated by Moore's actions, but she was demonstrably physically intimidated as reflected through her testimony that she could not escape from her lofted bed when Moore was touching her and because Moore was bigger than her.

Because Moore took many steps before cornering her in her bedroom, because he touched her against her will, and because of their parent-child relationship, among many other factors, a reasonable jury could have found Moore guilty of sexual battery. The Commonwealth

- 14 -

presented sufficient evidence of touching of intimate parts as well as force and intimidation, and so the circuit court was not plainly wrong to convict Moore for misdemeanor sexual battery of M.B.

CONCLUSION

For these reasons, the judgment of the circuit court is affirmed.

*Affirmed.*